DAVID PERSON AND CONNIE PERSON, PARENTS AND NATURAL GUARDIANS OF MICHAEL PERSON, A MINOR, APPELLEES, AND SCHOOL DISTRICT NO. 61 OF HAMILTON COUNTY, INTERVENOR-APPELLEE, V. DEPARTMENT OF SOCIAL SERVICES, APPELLANT.

453 N.W.2d 390

Filed March 30, 1990.   No. 87-1147.

Robert M. Spire, Attorney General, and Royce N. Harper for appellant.

James D. Livingston, of Cunningham, Blackburn, Livingston, Francis, Cote, Brock & Cunningham, for appellees.

John F. Recknor, of Barlow, Johnson, DeMars & Flodman, for intervenor-appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

GRANT, J.

This is an appeal by the Department of Social Services from a judgment entered by the district court for Hamilton County which reversed the order of the director of the Department of Social Services denying Michael Person's application for public medical assistance. We affirm the judgment of the district court.

Michael Person was a 5-year-old child at the time of his application for medical assistance and was afflicted with cerebral palsy, profound mental retardation, seizure disorder,

and spastic quadriplegia. Michael required total assistance in dressing, bathing, toileting, and eating. Michael could not speak or walk, required assistance to stand, and required physical and occupational therapy. Michael endured sleeping disturbances causing him to shout at night and had difficulty swallowing, which caused frequent choking. His medical needs included seizure medication to control grand mal and petit mal seizures, and observation and intervention for chronic ear infections.

Prior to September 11, 1986, Michael lived with his parents in Hordville, Nebraska. In the early summer of 1986, Michael's family and physician determined that Michael could no longer be cared for in the home and required 24-hour institutional care. A letter from Michael's physician dated August 29, 1986, states that Michael was increasingly difficult to handle and at times needed to be placed in a crib with a top on it to maintain him physically. Michael was frequently unable to attend school because of his chronic ear infections and consequently was not provided with necessary physical and occupational therapy. Michael's physician's letter concluded,

It is my impression and feeling that Michael has reached the age and size to where he no longer can be adequately cared for in his home environment, there being two other smaller siblings [and] this child's needs would be best served by an institutional-type setting with 24 hour care availability.

On June 18, 1986, the Persons visited Bethphage Mission (Bethphage), an institution in Axtell, Nebraska, and Michael was placed on Bethphage's waiting list. Although not explicitly stated in the record, it appears Bethphage was certified under federal and state regulations as an intermediate care facility that provides services to the mentally retarded (ICF/MR). The Persons sought financial assistance for Michael's placement in Bethphage from the Nebraska medical assistance program, which disburses funding provided through the federal medicaid program. Neb. Rev. Stat. § 68-1021 (Reissue 1986). The Department of Social Services argues that to obtain funding from Nebraska's medical assistance program on behalf of an admittee such as Michael, Bethphage was required to comply

with the admission criteria set out in 42 C.F.R. § 442.418 (1985). That federal regulation states:

(a) Except as provided in paragraph (c) of this section, an ICF/MR may not admit an individual as a resident unless his needs can be met and an interdisciplinary professional team has determined that admission is the best available plan for that individual.

(b) The team must—

(1) Conduct a comprehensive evaluation of the individual covering physical, emotional, social, and cognitive factors; and

(2) Before the individual's admission—

(i) Define his need for service without regard to the availability of those services; and

(ii) Review all available and applicable programs of care, treatment, and training and record its findings.

(c) If admission is not the best plan but the individual must be admitted nevertheless, the ICF/MR must—

(1) Clearly acknowledge that the admission is inappropriate; and

(2) Initiate plans to actively explore alternatives.

In addition to compliance with the federal regulation, the Department of Social Services also argues Bethphage was required to comply with the state's admission criteria which implement the federal regulation, including Nebraska Department of Social Services regulation 471 Neb. Admin. Code, ch. 12, § 12-007.03A (1982), which states:

Best Available Plan: The ICF/MR's interdisciplinary team shall acknowledge as inappropriate admissions, clients eligible to receive services provided by other agencies and other levels of care (i.e. foster care, ICF care, Office of Mental Retardation, other non-Medicaid programs, etc.) until the ICF/MR receives verification from the other agencies/levels of care that their services are not appropriate/available for the client. The best available plan is based on the lack of appropriate and available alternatives for the client. At the preadmission evaluation, plans must be initiated to explore other alternatives on an ongoing basis.

The requirement in § 12-007.03A that the interdisciplinary team obtain verification that no other appropriate assistance is available in other levels of care apparently relates to the Department of Social Services' policy that the "best available plan" includes placement in the "least restrictive environment," which is the environment in which the applicant's "needs" can be met in the most family-like setting with the greatest exposure to the community. See 471 Neb. Admin. Code, ch. 12, § 12-001.01 (1989), which states that the purpose of the medical assistance program is to help clients attain or retain their capacity for independence or self-care in the least restrictive environment. See, also, 471 Neb. Admin. Code, ch. 12, § 12-001.03 (1982 & 1989), which defines "least restrictive environment" as the most appropriate living environment which meets the client's individual needs and enables the client to exercise more personal choice in daily activities. The Persons do not challenge the Department of Social Services' policy of limiting medical assistance to appropriate care provided in the least restrictive environment.

In an attempt to obtain the verification required by § 12-007.03A, on August 4, 1986, a caseworker from Bethphage contacted the Mid-Nebraska Mental Retardation Services, Inc. (Mid-Nebraska), and requested a statement from Mid-Nebraska that Mid-Nebraska could not serve Michael. In response, Mid-Nebraska sent personnel to interview Michael and his family at Michael's home on August 6, 1986. Mid-Nebraska concluded in a preliminary report and proposal, dated August 13, 1986, that Mid-Nebraska could serve Michael by providing either temporary in-home assistance, licensed foster care, or temporary placement in an adult group home. Various potential foster care and group home placements were further explored during the month of August, as evidenced by a refined proposal by Mid-Nebraska dated August 26, 1986. This proposal contained in a letter to Bethphage indicated licensed foster care homes were available in York and McCool Junction and indicated there was an extended family apartment with a 24-hour staff available in York.

Michael's parents, his physician, and his educational service unit, see Neb. Rev. Stat. §§ 79-2201 and 79-2201.02 (Reissue

1987), decided that the alternatives proposed by Mid-Nebraska were inadequate and placed Michael at Bethphage on September 11, 1986. In conjunction with the admission, the interdisciplinary team at Bethphage prepared a preadmission report designed to address the admission criteria in the federal and state regulations cited above. The interdisciplinary team consisted of 11 professionals specializing in different areas, including medicine, occupational therapy, nutrition, psychology, speech therapy, religious ministry, social service, special education, residence, and recreation. The team included a "qualified mental retardation professional," as defined in 471 Neb. Admin. Code, ch. 12, § 12-006.20 (1982), a Bethphage unit nurse, and the director of nursing at Bethphage. In relation to 42 C.F.R. § 442.418(b)(2)(i), the interdisciplinary team report indicated that ICF/MR placement was recommended by each discipline. In relation to 42 C.F.R. § 442.418(b)(2)(ii), the interdisciplinary team noted that none of the Mid-Nebraska proposed services were immediately available. The report indicates that the interdisciplinary team reviewed Mid-Nebraska's August 13 proposals but does not mention the August 26 letter. The report noted that Michael's family questioned whether Mid-Nebraska could satisfy Michael's needs, but failed to address the issue independently. The report stated that the interdisciplinary team would review Michael's status in 30 days and that alternative placements would be sought on an ongoing basis. The report stated, "This placement is considered temporary until such time as placement is found in a less-restrictive environment which is capable of meeting Michael's needs."

A medical review team of the Department of Social Services received Michael's application for funding through the medical assistance program sometime between October 10 and 31, 1986. The record does not provide a description of members of this particular medical review team or their qualifications. A medical review team is defined by 471 Neb. Admin. Code § 12-001.03 (1982) as a "field/central office team consisting of a registered nurse and one or more of the following: 1. Physician; 2. Registered nurse; 3. Social worker; 4. Mental retardation program consultant; and 5. Other professional

personnel as necessary."

Michael's application for medical assistance included a necessary form filled out by a second physician (not Michael's personal physician) who examined Michael. The form provided a checklist and asked the physician's professional judgment as to the type of service that Michael should have to meet his required needs. Among the alternatives presented in the checklist were in-home services and alternate living arrangements, including residential care facility, adult foster home, or domiciliary facility. The physician did not check these alternatives, but checked the category "other" and filled in "ICF/MR." In another portion of the form, the physician was asked to recommend a treatment program, and the physician responded "Bethphage program."

On October 31, 1986, the medical review team rejected Michael's application. A member of the medical review team stated that funding was denied to Michael because the review team determined that placement at Bethphage was not the best available plan, as less restrictive alternatives were appropriate and available.

The Persons appealed the determination of the medical review team to the director of the Department of Social Services, pursuant to Neb. Rev. Stat. §§ 68-1024 and 68-1016 (Reissue 1986). An administrative hearing was held before a hearing examiner, apparently designated by the director, on March 6, 1987. The adequacy and availability of the various alternatives proposed by Mid-Nebraska were discussed at the hearing. The two primary alternatives discussed were in-home services and foster home care. Although the initial foster home alternatives were not available, alternatives located in neighboring counties were available, as noted in the August 26 letter discussed above, as was an additional proposal by Mid-Nebraska on October 8, 1986, of a group home available for Michael on October 20, 1986. We note that the record reveals very little as to the nature of the care available in the foster home alternatives. Although the record does show that the extended group home provided a 24-hour supervisory staff, it also indicates that 24-hour care was to be discontinued in that alternative.

The Persons argued that the in-home services were inadequate because Michael required 24-hour care, and Mid-Nebraska only offered 48 hours of in-home assistance per week. When the executive director of Mid-Nebraska was asked whether Mid-Nebraska could provide 24-hour care in the Person home, he responded that there was no such program in place, but that Michael's needs would be met.

The Persons challenged the appropriateness of the alternative foster homes primarily on the grounds that the educational service unit was unable to find physical and occupational therapists available to adequately serve Michael at Mid-Nebraska's proposed locations. In response to this argument, a member of the medical services division of the Department of Social Services stated that it was the educational service unit's responsibility to provide physical and occupational therapy at the alternative locations, implying that the plan could not be considered as not being the best available merely because a different government entity was failing in its duty.

In regard to Michael's education and therapy generally, we also note that the record contains a November 6, 1986, report by the education service unit personnel which compared the services available to satisfy Michael's educational needs at home, at the extended group home, and at Bethphage. The report concluded:

> Michael's education program can be delivered consistently and regularly, regardless of sickness or health, only at Bethpage [sic] Mission. In either of the other cases, the educational program can only be delivered when Michael is well, and if a "back-up" plan using some different personnel could be arranged and delivered when he is sick, it would be inconsistent and irregular at best.

Although the Persons did not raise any specific medical objections to the foster home and extended group home alternatives, they challenged the basis of the medical review team's determination that Michael's medical needs could be satisfied by the Mid-Nebraska proposals, in view of the recommendation of the two physicians that Michael be treated in an institutional-type or ICF/MR setting. The hearing officer

responded that she would have to reconcile the physicians' statements with the ICF/MR's (interdisciplinary team's) statement that the placement at Bethphage was inappropriate. As noted below, the ICF/MR made no such statement.

The specific findings and recommendations of the hearing officer are not disclosed by the record. In a finding and order dated April 24, 1987, the Director of Social Services affirmed the medical review team's rejection of Michael's application because Michael's September 11, 1986, placement in Bethphage was not the "best available plan," as required by Nebraska Department of Social Services regulation, § 12-007.03A, and 42 C.F.R. § 442.418. The director determined that Michael's medical and educational needs could be satisfied in a less restrictive environment which was appropriate and available, although the director did not specify any such alternative. The director also found: "From the evidence submitted, it appears that the appellant's [Michael's] placement at Bethphage Mission was made solely for educational purposes, and that Michael Person's physical condition does not require the level of care provided at this facility." This statement evidences the Department of Social Services' position that Michael's medical needs could be met in a less restrictive environment, and therefore Michael's placement at Bethphage was necessary solely because the educational service unit was able to provide physical and occupational therapy at Bethphage, but was unable to provide the therapies at the less restrictive locations proposed by Mid-Nebraska.

The Persons appealed to the district court for Hamilton County, which reviewed the director's finding and order based upon the evidence presented at the administrative hearing. See, generally, Neb. Rev. Stat. § 84-917 (Reissue 1987). School District No. 61 of Hamilton County intervened, claiming an interest based upon its obligation to provide special education for Michael. The intervention was apparently in response to the Director of Social Services' indication that funding for Michael's admission to Bethphage was available from education funds. The district court reversed the director's determination and found, in summary, that (1) Michael's greatest need is health care of a magnitude greater than can be

provided in a home atmosphere or even a modified noninstitutional setting, (2) the director's finding that Michael's placement at Bethphage was solely for educational purposes is totally unsupported by the evidence, (3) the director's finding that Michael does not require the level of care furnished at Bethphage is totally unsupported by the evidence, (4) the alternatives presented by Mid-Nebraska were not available and had certain drawbacks which rendered the alternatives less desirable than placement at Bethphage, and (5) placement at Bethphage was the best available plan.

The Department of Social Services appeals from this ruling and contends, in summary, that the district court erred (1) in holding the record did not support the director's determination that placement of Michael in an ICF/MR was not appropriate under the medical assistance program and that the placement was for educational purposes, and (2) in holding that the less restrictive alternatives proposed by Mid-Nebraska were not proper and available.

The scope of our review is governed by Neb. Rev. Stat. § 84-918 (Cum. Supp. 1989), which states in part:

> (2) When the petition instituting proceedings for review [under the Administrative Procedure Act] was filed in the district court before July 1, 1989, the appeal shall be taken in the manner provided by law for appeals to the Supreme Court in civil cases and shall be heard de novo on the record.

Because the petition which instituted these proceedings in the district court was filed May 11, 1987, our review is de novo on the record, and we reach "a decision independent of all dispositions that have gone before." *Department of Health v. Columbia West Corp.*, 227 Neb. 836, 838, 420 N.W.2d 314, 316 (1988). As we stated in *Columbia West, supra*, we follow the legislative mandate "regardless of the incongruity of a true de novo review." *Id.* Consequently, we consider neither whether there was sufficient evidence to support the director's findings, nor whether the district court erred in its determination that there was not sufficient evidence to support the director's findings. Rather, we shall use the assignments of error as a guide to the factual issues in dispute and make an independent

factual determination based upon the record.

42 C.F.R. § 442.418(a) appears to place the responsibility for determining the best available plan for Michael upon the "interdisciplinary professional team." In addition, with reference to the state medical assistance program, the Department of Social Services regulations placed the responsibility of determining the appropriate level of care, which includes a determination of the best available plan, with a medical review team of the Department of Social Services. See 471 Neb. Admin. Code, ch. 12, § 12-002.03D(4) (1982). See, generally, current regulations, 471 Neb. Admin. Code, ch. 12, §§ 12-006.03 and 12-006.04 (1989). We note that the Department of Social Services does not argue that the verification requirement of § 12-007.03A placed the power to determine the best available plan with Mid-Nebraska or that the verification requirement affects this litigation in any manner. The Persons do not challenge the medical review team's power to have made a determination of the best available plan for Michael independent of the interdisciplinary team for the purposes of funding under the medical assistance program. Accordingly, we rely on the application and reports submitted to the medical review team, plus the additional exhibits admitted at the administrative hearing, and in our de novo review make an independent determination as to the best available plan for Michael as defined in the federal and state regulations.

A party appealing from the denial of an application for public assistance has the burden of proving the party's entitlement to the benefits. *Dobrovolny v. Dunning*, 221 Neb. 67, 375 N.W.2d 123 (1985). Therefore, the Persons were required to demonstrate by a preponderance of the evidence that Michael's placement at Bethphage was the "best available plan."

We begin by noting our frustration with the record before us. The administrative hearing, although intended to be a judicially reviewable proceeding, amounted to little more than a discussion, with each side arguing only its conclusions. The record of the administrative hearing does not identify the parties, counsel, or the witnesses' qualifications. We cannot

assess the weight to be given to the conclusory statements of witnesses without knowing their qualifications. We recognize. that an administrative hearing need not be conducted in the same fashion as a courtroom jury trial, but if an administrative hearing is to be judicially reviewed (and most particularly when this court's review is de novo on the record), the procedure must be such as to establish the facts supporting the ultimate conclusions regarding the issues in the case.

Associated with the shallow record is the director's failure to inform the Persons in the hearing notice of the issues to be determined at the hearing, as required by Neb. Rev. Stat. § 84-913 (Reissue 1981). The hearing notice sent to the Persons by the Department of Social Services merely "encouraged [the Persons] to submit pertinent information."

The following is typical of the hearing:

> Mr. Livingston [Persons' attorney]: You knew about his [Michael's] disturbances?
>
> Mr. Foley: [director of Mid-Nebraska]: I was informed of them, yes.
>
> Ms. Swinton [hearing examiner]: Lu Rejda has a comment to add to that.
>
> Ms. Rejda: Mr. Livingston, this is Lu Rejda with the Department of Social Services.
>
> . . . .
>
> . . . It was my understanding that Mid Nebraska, the community based services, were not made aware of Michael Person's case and that he was residing in his parents' home and that no services had been sought prior to looking at admission to an ICF-MR facility. Therefore, they would have had no way of knowing that he was out there and needed the services. It is a requirement of state and federal regulations that...
>
> Mr. Livingston: I'd like to ask if I'm arguing with you, ma'am, or do I have a chance to question the people.
>
> Ms. Rejda: No, no. I just wanted to explain...
>
> Ms. Swinton: She just wanted to make a comment.
>
> Ms. Rejda: ...some of this Mr. Livingston, that it's a state and federal regulation before approval to an ICF-MR facility that exploration of alternative services in

a less restrictive environment. That is also the responsibility of the ICF-MR facility to seek out and to look into these alternatives.

. . . .

Mr. Livingston: Would you, could you have provided 24 hour skilled nursing care around the clock?

Mr. Foley: Well, you know, we're not a skilled nursing facility, Jim.

Mr. Livingston: No. Thank you.

Ms. Swinton: Lu has another comment.

Ms. Rejda: Again this is Lu Rejda and there's no indication that Michael requires 24 hour skilled nursing care. Bethphage at Axtell or any ICF-MR facility is not required to provide 24 hours of skilled nursing care.

Mr. Livingston: Does anybody else have any comments or can I continue my questions?

Ms. Swinton: Mr. Livingston, this is an informal gathering. I think the people here are just trying to make, to provide all the information that is necessary in order to, to make this a fair hearing.

An administrative hearing is not an "informal gathering." It is part of a process to establish facts so that informed decisions can be made.

The record in this case does not provide adequate information with regard to how Michael's medical needs would be met by the proposed Mid-Nebraska alternatives. The most credible evidence before this court, and the only qualified expert opinions before this court, includes the opinion of Michael's physician that Michael needs 24-hour care in an institutional-type setting and the opinion of another physician who examined Michael for the medical assistance application that Michael needed the level of care provided by an ICF/MR and that recommended the Bethphage program for treatment. The medical discipline of the interdisciplinary review team also recommended ICF/MR placement for Michael. Although neither the physicians nor the interdisciplinary team explicitly addressed the potential of providing for Michael's medical needs in the less restrictive environments proposed by Mid-Nebraska, it is evident that the alternatives were

considered to some degree and rejected.

As noted above, the hearing officer believed that she needed to reconcile the physicians' statements with the statement of the interdisciplinary team that the placement at Bethphage was inappropriate. Apparently, the hearing officer drew the conclusion that the interdisciplinary team found the placement at Bethphage to be inappropriate from the interdisciplinary team's statement that the placement at Bethphage was temporary. From this statement she apparently inferred that the interdisciplinary team concluded that Michael did not require the level of care at Bethphage. This argument is adopted by the Department of Social Services in its brief, which argues that the interdisciplinary team report "states that the placement was considered temporary in nature and would terminate when a less restrictive placement was located. In other words, Bethphage acknowledged that it was not the best available plan . . . ." Brief for appellant at 7.

The conclusion that the interdisciplinary team deemed Michael's placement at Bethphage as inappropriate is not supported by the record. The interdisciplinary team's report did not explicitly state either that placement at Bethphage was inappropriate or that it was the best available plan. In view of the recommendation of the "medical discipline" in the interdisciplinary report that Michael be placed in an ICF/MR, the report's statement that the placement was temporary should be interpreted as merely stating that Michael's needs and the alternatives available will change over time and should be reevaluated from time to time. The continuous search for less restrictive alternatives is required by § 12-007.03A, and this requirement is not conditioned upon a finding of inappropriateness by the interdisciplinary team.

The only comparison of Michael's alternatives found in the record was an evaluation of the quality of the physical and occupational therapy available in each alternative. The educational service worker concluded that the highest quality of therapy could be provided at Bethphage. Moreover, a December 6, 1985, recommendation by a third physician stated, "Michael's back lying and facial anatomy [make him] more prone to ear infections but for the interest of his program

[we] need to continue to try and get a handle on his otitis's [sic] [ear inflammations] as they are interfering with his education." In summary, the record shows that Michael is physically prone to ear infections, had endured chronic ear infections for some time, and continued to endure such infections at the time of his admission to Bethphage and that such infections interfere with his education and therapy outside an institutional setting. We note that these facts would not justify characterization of Michael's placement in Bethphage as solely for educational reasons, because it was Michael's chronic ear infections, a medical condition, which interfered with the provision of consistent therapy outside an institutional setting. Thus, even if the educational service unit was able to find physical and occupational therapists to serve Michael if he were placed at one of the Mid-Nebraska alternatives, our review of the record indicates that the best placement for Michael would still be at Bethphage because of his medical problems.

Although it is clear that the Department of Social Services and Mid-Nebraska personnel believed and concluded that Michael's medical and educational needs could be satisfied in an environment "less restrictive" than Bethphage, there is no factual basis stated in the record to support their conclusions. It may well be that the hearing examiner and the director of the Department of Social Services knew the qualifications and background of each of the witnesses and, therefore, the appropriate weight to be given their evidence, but that knowledge is not in the record and cannot be the basis of our decision. Consequently, we must rely on the evidence submitted containing the opinions of the three physicians discussed above. We know of the general expert knowledge and background of practicing physicians. The credibility of the physicians' opinions was not contested at the administrative hearing other than by the contrary assertions of witnesses whose qualifications are not before us. In the absence of any reason to question the foundation of the physicians' opinions, and in the absence of the means to assess the credibility of the witnesses to the contrary, we give greater weight to the evidence from the physicians than to the witnesses at the administrative hearing in our de novo review.

We note that the Department of Social Services has, in regulations applicable subsequent to time of the application at bar, addressed the need for a greater dialogue among the medical professionals in determining the best available plan for handicapped applicants like Michael. Under current regulations it appears that the medical review team is required to notify the client's attending physician of its determination that a client's placement is inappropriate and to allow that physician to present justification for the placement before the medical review team's determination becomes final. See, 471 Neb. Admin. Code, ch. 12, §§ 12-006.08B, 12-004.05B, and 12-004.03A (1989).

In conclusion, we find that Persons proved by a preponderance of the evidence that at the time of his application, Michael's medical problems required the level of care provided at Bethphage and that Michael's placement at Bethphage was the least restrictive alternative available that could satisfy Michael's needs and therefore was the best available plan. Accordingly, we affirm the order of the district court.

AFFIRMED.